Filed 5/11/22  P. v. Quintero CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077996 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS303737) |
| DANIEL RODRIGUEZ QUINTERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis Devaney, Michael T. Smyth, and Timothy Walsh, Judges. Affirmed as modified.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Daniel Rodriguez Quintero of first degree murder with the special circumstances of torture and kidnapping for ransom. Early in the case, Quintero asked to represent himself. The trial court granted his *Faretta*[1] motion and appointed the Office of Assigned Counsel (OAC) "to provide a legal runner and reasonable ancillary services." Quintero later raised concerns about the efficiency of OAC and, on two separate occasions, requested the appointment of "co-counsel" other than OAC or the public defender. The trial court denied both requests and, approximately three weeks later, Quintero relinquished his pro per status. He was represented by a public defender at trial.

On appeal, Quintero contends the trial court failed to exercise its discretion to appoint "advisory counsel"[2] and, instead, summarily denied his request as a matter of practice. He further contends the error is reversible per se because it would have been an abuse of discretion to deny the request had the trial court exercised its discretion. The Attorney General contends Quintero forfeited this claim by relinquishing his pro per status, the trial court did not fail to exercise its discretion, and, even if it did, the error was not prejudicial.

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2] Quintero asked the trial court to appoint "co-counsel," but on appeal he asserts the trial court erred by failing to appoint "advisory counsel." In response to Quintero's request, the trial court stated it would not appoint co-counsel or advisory counsel. Except when referencing the exact language Quintero used in the trial court, we refer to his request as a request for advisory counsel.

We reach the merits of Quintero's claim, but conclude the trial court did not fail to exercise its discretion and, even assuming so, any error does not require reversal. Quintero also asks us to vacate any unpaid portion of the $154 criminal justice administration fee imposed under the recently repealed Government Code section 29550.1. We shall modify the judgment to vacate any unpaid portion of that fee as of July 1, 2021, and affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial*

A. *Prosecution's Case*

Jesus Q. co-owned a tattoo shop and ran a T-shirt business with his brother, Jose Q., from the bottom floor of the shop.[3] The brothers also sold drugs and Jesus was known to use cocaine.

At about 8:30 p.m. on December 16, 2017, Jose saw Jesus at the tattoo shop when he went to unload some shirts at his T-shirt shop. Jesus helped Jose unload the shirts and Jose left about half an hour later. Jesus was alone when Jose left, but he later texted Jose and told him he was drinking with a friend at the tattoo shop. The friend left the shop at approximately 3:00 in the morning on December 17.

Jesus called Jose around the same time to tell him Quintero was outside the tattoo shop. Jose told Jesus to go inside and lock the door. Jesus told Jose he would call him back. When Jesus failed to call, Jose tried to call him. Jesus answered and Jose could hear people arguing. Jose asked to

---

[3] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim and witnesses by their first name and last initial, and then by their first names only.

3

speak to Quintero and asked him, "What's going on?" Quintero said: "Well, somebody owes me money. Somebody owes me a million dollars." Quintero then explained, "Ramon owes me money," that he could not get ahold of Ramon, and thought Jose or Jesus could because they were "closer" and "get along" better with Ramon.[4] Quintero hung up the phone.

Jose tried calling his brother back, but no one answered. Jose then reached Quintero through a Facebook call. When Quintero answered, Jose heard talking and "some sort of scuffle" in the background. He heard Jesus say: "You guys already hit me. You know, you guys already did what you did. You know, you guys already hit me and, you know, that's it. You know, let's just call that it." Jose believed his brother was "begging for his life." Quintero then told Jose, "[i]f you hang [up] the phone, you call the cops, I'm going to kill your brother." Jose heard the voice of at least one other person talking in the background and, at one point, Quintero told Jose, in a quieter, softer voice, "because they're trying to kill me and my family."

Quintero continued to demand money but changed the amount from a million dollars to $5,000. When Jose told him he had $2,000 at home, Quintero responded: "So that's what your brother's worth? $2,000? You think this the first time I do this?" Jose said he would need to make some calls to get more money, and Quintero agreed to let him hang up the phone to call Ramon. When Jose called Ramon, Ramon told him that he did not owe Quintero any money. Ramon refused to go to the tattoo shop but agreed to call Quintero. Quintero then told Ramon to stay out of it because "the problem was not with [him]."

---

[4]     This was a reference to a mutual acquaintance, Ramon G.

Jose began calling others, including Jesus's former girlfriend, Christina R., who agreed to call the police. Meanwhile, Jose drove to the tattoo shop. He arrived at about 6:30 a.m., parked across the street, and waited to see if there was any movement. He did not see any movement, so he left to meet Christina at a restaurant down the street from the tattoo shop and gave her the building key to give to the police.

At around noon, the police entered the tattoo shop in tactical gear. They found blood on the wall, tile, and stairs in the entryway. Jesus's body was lying on the floor at the top of the stairs. He was naked from the waist down, his legs were wrapped with an electrical cord, and his ankles were wrapped tightly with shoelaces. The police did not locate any other individuals inside the building.

The medical examiner testified Jesus died from "blunt head and neck trauma," and possible "mechanisms" of death included blunt force to the head and neck, and strangulation. Jesus had extensive injuries throughout his body, including blunt force trauma to the head, neck (including fractures to the hyoid bone), torso, and both his upper and lower extremities. He had a small skull base fracture, bruising and bleeding around and on the brain. His nose was broken, and he had bruising and lacerations near his eyes. The manner of death was homicide.

Forensic evidence established Quintero's presence at the scene of the murder. Quintero's fingerprints were on a beer bottle and tequila bottle in the tattoo shop. His fingerprints on the tequila bottle were in blood and DNA testing established it was Jesus's blood. There were shoe impressions with a distinctive tread pattern left on the floor of the tattoo shop, which were forensically matched to Quintero's sandals later seized during a search of his apartment. Cell phone tower data placed Quintero's phone in the vicinity of

5

the tattoo shop at the time of the murder; the phone was used for two voice calls, at approximately 2:35 a.m. and 3:24 a.m. The police collected fingerprints belonging to several other individuals, but did not determine who else, if anyone, was at the shop with Quintero at the time of the murder.

Quintero was detained on December 20, 2017, while crossing the border from Mexico into the United States. A detective asked Quintero if he had any knowledge about what happened at the tattoo shop. He initially denied having any information, but later said it involved the D.E.A. (Drug Enforcement Agency). Quintero was released but the police seized his phone and impounded his car. During a warrant search executed at Quintero's apartment later that week, police collected the sandals Quintero wore when he was detained at the border and which matched the shoe impressions left at the murder scene.

B.    *Defense Case*

Quintero testified in his own defense. He admitted he was at the tattoo shop and stayed at a nearby motel the night of Jesus's murder. He admitted his fingerprint, imprinted in Jesus's blood, was on the tequila bottle in the shop. And he acknowledged the sandals seized from him by law enforcement were the sandals he wore on the night of the murder.

Quintero testified, however, he was an alcoholic and was taking prescription muscle relaxers the week of the murder. As a result, he had frequent blackouts and a limited recollection of the days surrounding the murder. Quintero knew Jesus and Jose, and knew Jesus was co-owner of the tattoo shop. He had been staying at a motel near the tattoo shop on the night of the murder, but had no recollection of checking into the motel.

He left the motel to go to a party with his ex-wife on December 16, 2017. He drank heavily at the party, and his ex-wife dropped him off at the

6

motel sometime after dark. He went to the store to buy more alcohol, but it was closed. When he returned to the motel two men in the parking lot told him the 7-Eleven was open, so he walked there and purchased two bottles of wine. When he got back, he took his muscle relaxers and fell asleep.

The next thing Quintero remembered was drinking on the sidewalk in front of the motel. He did not know how long he had been there, or how long he had slept. He saw two men standing outside the tattoo shop. He walked towards them and recognized one as Jesus. He did not know the other man.

Quintero's next memory was lying on the sidewalk in front of the tattoo shop, alone and bleeding. He did not have a shirt on and recalled being hit again when he stood up to look for it. He saw Jesus standing in the doorway of the shop and saw another man running towards him. He thought he was going to get beat up again, so he started fighting with Jesus. The other man tackled Jesus and started screaming, saying Jesus had stabbed him. Quintero pulled the man off Jesus, and Quintero and Jesus fell onto the stairs inside the tattoo shop.

Jesus handed Quintero a phone. Quintero recalled talking to Jose on the phone, but the only detail of the conversation he could recall was telling Jose that Jesus beat him up. Jesus kicked or punched Quintero, causing him to hit his head. Then, Jesus and the other man began to fight again. Quintero did not recall what happened to Jesus's phone, but did recall Jose calling him back on his own phone and asking what was going on. He also remembered Jose saying he had $5,000 and that he was going to come to the shop.

Quintero's next memory was the other man telling him not to go outside because there were people out there. Jesus was unconscious on the landing of the stairs. Quintero next recalled Jesus grabbing him, although he

7

was not sure of the exact sequence of events. The other man pulled Jesus off Quintero and Quintero ran out of the tattoo shop and back to his motel room. Quintero had been in the building for 15 minutes. When he left, he did not know that Jesus was dead.

Quintero had told Jose where he was staying and was concerned Jose would come after him, so he got in his car to leave. As he was leaving, a man ran up to the car and got in on the passenger side. Quintero did not recognize the man but believed it was the same man that had been at the tattoo shop. The man said "Go, go, go," and Quintero started driving. Quintero's next memory was the man waking him up. Quintero was still driving but had stopped, and presumably fallen asleep, at a stoplight. He was on the phone with Ramon and the person in the car was asking, "Is he here with the money?" Quintero then drove to Mexico. He and the man checked into a motel, Quintero consumed some cocaine, and he and the other man went drinking at a club until Quintero ran out of money.

Quintero tried to cross back into the United States a few days later to go to work. He was drunk, hit another car while waiting in line at the border, and got into a fist fight with the other driver. Quintero was detained at the border and arrested a few days later.

On cross-examination, Quintero acknowledged writing a letter to law enforcement in March 2019, describing what happened on the evening of the murder. He conceded his prior statement was "very different" from his trial testimony. He explained the differences by saying he "filled in all the gaps in [his] memory" with "the police report and the transcripts," "what somebody angry would do at the time," and his "imagination."

Quintero's ex-wife also testified. She confirmed Quintero was drinking a lot at the party on December 16, 2017. She decided it was time to leave the

8

party around midnight and dropped Quintero off at the motel on her way home.  Quintero was "very drunk."

The defense also called an emergency room physician and a psychologist as expert witnesses.  Each testified about the effects of alcohol on memory, behavior, and judgment.  Both discussed blackouts and confabulation, a phenomenon in which alcoholics try to make sense of what happened by filling in memory gaps caused by fragmentary blackouts.

During closing arguments, defense counsel asserted Quintero was guilty of manslaughter, but not murder.  She argued the prosecution had not proven intent, in part because the evidence showed Quintero was extremely intoxicated.

C.      *Verdict and Sentencing*

The jury convicted Quintero on all charged counts:  first degree murder (Pen. Code,[5] § 187, subd. (a); count 1); kidnapping for ransom (§ 209, subd. (a); count 2); and torture (§ 206; count 3).  As to the murder charge, the jury found two special circumstances to be true—murder in the commission of a kidnapping (§ 190.2, subd. (a)(17)) and intentional murder with infliction of torture (§ 190.2, subd. (a)(18)).  As to the kidnapping charge, the jury found the special allegations that the victim suffered bodily harm and death and was intentionally confined in a manner which exposed him to a substantial likelihood of death to be true.

The trial court sentenced Quintero to prison for life without the possibility of parole on each of the murder kidnapping convictions, and life in prison on the torture conviction.  As to the sentences on the kidnapping and torture convictions, the court stayed them pursuant to section 654.  The court

---

[5]      Further unspecified statutory references are to the Penal Code.

9

also imposed various fines and fees, including a $154 criminal justice administration fee pursuant to now-repealed Government Code section 29550.1.

DISCUSSION

I.

*The Trial Court Did Not Abuse Its Discretion By Denying Quintero's Request for Advisory Counsel*

Quintero asserts the trial court failed to exercise its discretion when it denied his request for advisory counsel, during a brief period in which he was representing himself in pro per. He further contends the error requires reversal per se because it would have been an abuse of discretion to deny the request if the trial court had exercised its discretion. The Attorney General contends Quintero forfeited the argument by relinquishing his right to represent himself and accepting appointed counsel. We decline to resolve the issue based on forfeiture, but conclude the trial court did not fail to exercise its discretion and, even if it did, the error was not prejudicial.

A. *Relevant Pre-Trial Proceedings*

Quintero was initially represented by the San Diego County Public Defender Office. He asked to represent himself in February 2019, relatively early in the proceedings. He explained to Judge Francis Devaney, then presiding, that he did not want his attorney to vigorously cross-examine certain witnesses because another individual had been executed shortly after the murder and he did not want to place anyone else in danger.[6] However,

---

[6] At trial, a detective testified there was a fingerprint and palm print on an exterior door to the tattoo shop matched to an individual named Jose Z. The police were not able to connect Jose Z. to Jesus or the murder. Jose Z.'s

10

he understood any appointed attorney would have an ethical obligation to put on a zealous defense. The court granted Quintero's request for pro per status, and appointed OAC "to provide a legal runner and reasonable ancillary services."

At a readiness hearing on April 22, 2019, Quintero presented a discovery motion, but agreed to take it off calendar after Judge Devaney explained he first needed to use the informal discovery process. Quintero then said, "I want to file an injunction on OAC," and asserted OAC was not providing adequate assistance with the discovery process. Judge Devaney explained to Quintero that he would need to ask OAC to file a motion regarding his discovery issues and complaints about OAC, in the appropriate department. The trial court and Quintero had the following exchange:

> "[Quintero]: I do want to ask the [c]ourt for a court counsel that is not affiliated with OAC.
>
> "[Court]: Well, you want me to reappoint the public defender?
>
> "[Quintero]: No. I have a conflict of interest with the public defender on my last hearing on the *Faretta* hearing. I made a crucial mistake saying that the person claiming responsibility got executed, but I was wrong. The person claiming responsibility is still out there. The other person known to the alleged victim is the one that got executed and my public defender did not know that after six months of having my case. And I think that she would have -- I told her a few weeks when I filed the *Faretta* and she didn't look up the paperwork.
>
> "[Court]: I don't need all that background in front of the public defenders. [¶] What exactly are you asking me to do?
>
> "[Quintero]: I need for the [c]ourt to assign me co-counsel that is not affiliated with OAC, because OAC makes me sign a contract

mother told the police he was assassinated in Mexico shortly after Jesus's murder.

11

waiving my rights, and I don't agree with the contract with OAC waiving my rights.

"[Court]: Okay. Mr. Quintero, you are going to either represent yourself or I will appoint the public defender or the alternate public defender, but I'm not appointing co-counsel. You can either be your own attorney or you can be represented by an attorney. I'm not going to appoint co-counsel. [¶] So are you asking me to revoke your pro per status and appoint an attorney to represent you?

"[Quintero]: I believe in the interest of justice it would be better to have a co-counsel so that this moves on faster. And if you say that I'm not having a co-counsel, I'll stay as pro per. But the time it's going to take me --

"[Court]: I don't want to tell you what to do. We had this conversation. I told you what I think about someone in your shoes, with a murder charge, representing themselves. I already told you it's not a wise idea. But there is no such thing as co-counsel. It's either you're on your own in pro per or I assign you an attorney and you can assist that attorney. That attorney has obligations towards you. But there is no co-counsel. So if you want to continue to represent yourself sitting next to an attorney, that is not going to happen. It is either you're on your own or you're represented. What is your choice?

"[Quintero]: I'll stay on my own.

"[Court]: All right."

OAC filed Quintero's motion and the trial court held another hearing on May 1, 2019. Judge Michael T. Smyth was now presiding. Quintero raised a number of specific concerns, which the court addressed. The following exchange occurred at the conclusion of the hearing:

"[Quintero]: May I ask a comment or a question? You said that you were able to appoint a public defender again in this court?

"[Court]: Right.

"[Quintero]: Due to my limitations as a KSA[7] inmate, is it possible so that I have full access with the board of lawyers to cross-examine for the court to assign me a co-counsel? That way all the motions that establish my defense, I can send that straight to that co-counsel.

"[Court]: We don't do co-counsel here. I don't do that. We can have someone represent you, but *in this circumstance*, I would not be doing co-counsel or advisory counsel."[8] (Italics added.)

A few weeks later, on May 20, 2019, Quintero relinquished his pro per status and accepted appointed counsel. He was represented by the public defender at trial.

B. *Forfeiture*

We begin our analysis with the Attorney General's assertion that Quintero forfeited his claim of error regarding the trial court's denial of his request for advisory counsel by subsequently accepting appointed counsel. The Attorney General provides no authority, nor are we aware of any, establishing that a self-represented defendant waives or forfeits the claim of an erroneous denial of advisory counsel by subsequently relinquishing his self-represented status.

The Attorney General relies primarily on *People v. Stanley* (2006) 39 Cal.4th 913. There, the defendant "orally interposed [a] request for self-

---

7    KSA means "keep separate all" and is a restricted housing status requiring certain inmates be kept separate from others.

8    The transcript for the hearing was sealed for Quintero's benefit because he raised issues relevant to his defense as a self-represented defendant. The quoted portion of the transcript does not reveal those defenses and Quintero included the same passage in his opening brief. He has therefore waived any objection to our inclusion of the passage in this opinion.

13

representation during a renewed *Marsden*[9] motion made in municipal court one year before his preliminary hearing and nearly two years before the start of trial, out of apparent annoyance or frustration with his first appointed counsel." (*Id.* at pp. 932–933.) The defendant never renewed the request but subsequently accepted a substitution of appointed counsel, as well as the appointment of an additional attorney to assist the primary appointed counsel. (*Id.* at p. 933.) The California Supreme Court concluded, "[i]n light of defendant's subsequent acceptance of several appointed counsel to represent him without ever renewing his request for self-representation," he abandoned his desire to be self-represented and therefore waived the issue on appeal. (*Ibid.*)

We cannot reach the same conclusion regarding Quintero's request for advisory counsel in this case. Quintero raised his request twice in less than two weeks and only accepted appointed counsel after the trial court denied both requests, leaving him with the choice of continuing to represent himself without assistance or accepting appointed counsel. The Attorney General asserts there is no evidence the trial court's denial of Quintero's request for advisory counsel had any bearing on Quintero's decision to accept appointed counsel. To the contrary, Quintero began the second inquiry by confirming the trial court could still appoint a public defender, but indicated his preference was to represent himself with the assistance of "co-counsel." We are not convinced that Quintero's subsequent relinquishment of his pro per status, under these circumstances, constituted a forfeiture of the claim he now asserts. So we will address the merits of Quintero's claim.

---

9      *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

14

C.     *Advisory Counsel*

Turning to the merits, we are not persuaded the trial court failed to exercise its discretion when it denied Quintero's requests for advisory counsel.

" 'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.' [Citation.] '[T]he Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself without counsel.' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 545.) A defendant who chooses self-representation may request, but does not have a constitutional right to, advisory counsel. (*People v. Doane* (1988) 200 Cal.App.3d 852, 861, disapproved on other grounds in *People v. Barnum* (2003) 29 Cal.4th.1210.) "[T]he decision to appoint an advisory counsel lies within a trial court's discretion." (*Doane,* at p. 861.) If the trial court does appoint advisory counsel, they typically serve a "narrow role . . . giving legal advice and assistance to a defendant who has the control and responsibility for his own defense." (*Id.* at p. 864; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1368 ["When a defendant chooses self-representation, he or she retains primary control over the conduct of the case, and consequently the role of advisory counsel is limited."].)

The California Supreme Court, in *People v. Crandell* (1998) 46 Cal.3d 833 (*Crandell*), explained that: "When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion. [(*People v. Bigelow* (1984) 37 Cal.3d 731, 743 (*Bigelow*).)] We held in *Bigelow* that failure to exercise discretion on a request for advisory counsel *in circumstances where a refusal to grant the*

15

*request would be an abuse of discretion* requires automatic reversal of a resulting conviction because of the inherent difficulty in assessing prejudice." (*Crandell*, at p. 861, citing *Bigelow*, at pp. 744–746, italics in original.) However, as the Court further explained, "*Bigelow, supra*, 37 Cal.3d 731, did not establish a 'fixed rule' that advisory counsel must be appointed for every pro se defendant in a capital case, and thus the question whether denial of a request for advisory counsel would have been an abuse of discretion must be determined on a case-by-case basis." (*Crandell,* at p. 863.)

Where the trial court fails to acknowledge or exercise its discretion in refusing to appoint advisory counsel, but the denial would *not* have been an abuse of discretion if the court *had* exercised its discretion, prejudice is assessed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Crandell, supra*, 46 Cal.3d at pp. 864–865.) Under the *Watson* standard, the error is prejudicial and requires reversal if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred. (*Watson*, at p. 836.)

Here, Quintero asserts the trial court failed to exercise its discretion because it did not engage "in a reasoned exercise of judgment based on an examination of the particular circumstances of this case," and instead, issued a blanket ruling. (See *Crandell, supra,* 46 Cal.3d at p. 862.) We begin with the presumption the trial court both understood and appropriately exercised its discretion. (See *People v. De Jesus* (1995) 38 Cal.App.4th 1, 29.) The trial court need not affirmatively acknowledge its discretion. (*Ibid.*) Rather, Quintero, as the appellant, has the burden of demonstrating "the trial court failed to perceive its power." (*Ibid.*) We acknowledge the trial court made broad statements about its willingness to appoint advisory counsel in each instance. And those statements might be taken as blanket rulings, if read in

16

isolation. However, when read in context, we conclude the trial court did understand that it had the discretion to appoint advisory counsel, and that it did consider the specific circumstances of the case before denying Quintero's request.

When Quintero first asked the trial court to assign "co-counsel" not associated with OAC, Judge Devaney responded, in part, "I'm not going to appoint co-counsel." Quintero persisted and the court stated, in part, "there is no co-counsel." Although the later statement appears conclusory in nature, in full context, we perceive it as the trial court's attempt to explain to a self-represented defendant, in simple straightforward language, that co-counsel was not an option *in this case*. Quintero then renewed his request at a subsequent hearing in a different department, with a different judge. Like the first request, the second was in the context of complaints about OAC and, specifically, OAC's efficiency in responding to Quintero's administrative requests. Judge Smyth initially told Quintero, "We don't do co-counsel here," but then clarified, "*in this circumstance*, I would not be doing co-counsel or advisory counsel." (Italics added.)

This is not a case, as Quintero urges, like *Crandell* or *Bigelow*, in which the trial court expressly stated, " 'there is no such thing' " as advisory counsel (*Crandell, supra,* 46 Cal.3d at p. 857) or that advisory counsel is " 'not permitted under California law' " (*Bigelow, supra,* 37 Cal.3d at p. 740), without any further clarification. Instead, this case is more like *People v. Choi* (2021) 59 Cal.App.5th 753 (*Choi*). In *Choi*, the trial court responded to a request for advisory counsel by stating, "That's not the way it's done in this courthouse." (*Ibid*.) However, the trial court also acknowledged it did have the authority to appoint advisory counsel, and explained the defendant made a choice to represent himself and "was 'smarter than most.' " (*Id*. at

17

pp. 767–768.) Viewing the trial court's comments in context, the appellate court was "satisfied the [trial] court did not apply a blanket practice of denying advisory counsel without exercising its discretion under the circumstances." (*Id.* at p. 769.) Similarly considering the trial court's comments in context here, we cannot conclude the trial court failed to recognize or exercise its discretion.

Even if we were to conclude the trial court did fail to exercise its discretion, which we do not, reversal would not be warranted. As we explain, the record before us "does not demonstrate that denial of [Quintero's] request for advisory counsel would have been an abuse of discretion." (*Crandell, supra,* 46 Cal.3d at p. 864.) Thus, "*Bigelow* is distinguishable and its rule of per se reversal does not govern." (*Ibid.*) We instead apply the *Watson* harmless error standard and conclude it is not reasonably probable the result would have been more favorable to Quintero in the absence of the purported error. (*Crandell,* at pp. 864–865; *Watson, supra,* 46 Cal.2d at p. 836.)

"The factors which a court may consider in exercising its discretion on a motion for advisory counsel include the defendant's demonstrated legal abilities and the reasons for seeking appointment of advisory counsel." (*Crandell, supra,* 46 Cal.3d at p. 863 [concluding trial court does not abuse its discretion by denying a request for advisory counsel that is essentially a manipulative end run around the denial of a *Marsden* motion].) The court may also consider the defendant's general education level, the seriousness of the charges, and the overall complexity of the case. (*Bigelow,* 37 Cal.3d at pp. 743–744.)

As an initial matter, we note this case presents a unique set of circumstances. First, as the trial court acknowledged, this was not a typical case in which Quintero believed he could do a better job than the public

18

defender.  Rather, Quintero's stated reason for wanting to represent himself was he did not want his attorney to "adequately, diligently represent" him at trial.  As Quintero explained to the trial court, he did not want his appointed attorney to vigorously cross-examine certain witnesses.

Second, the scope of Quintero's request for advisory counsel was limited.  After raising complaints about OAC, Quintero asked for "co-counsel that is not affiliated with OAC, because . . . [he did not] agree with the contract with OAC waiving [his] rights."  Quintero renewed his request at the next hearing after raising complaints about the efficiency of OAC, and said he wanted "co-counsel" so he could send "all the motions that establish my defense . . . straight to that co-counsel."  Quintero did not, at any point, indicate he needed legal assistance to prepare those motions, or any other part of his defense.

Third, Quintero's requests appear to have been motivated primarily by his stated concerns with the public defender and OAC.  Quintero first asked for "counsel that is not affiliated with OAC."  When the trial court inquired whether Quintero wanted it to reappoint the public defender, Quintero declined, citing the alleged conflict of interest, and stated he wanted "co-counsel that is not affiliated with OAC."  Thus, the record suggests Quintero was actually seeking substitute counsel for OAC, or, put another way, assistance from an appointed counsel that was not the public defender or OAC.[10]  As the Court in *Crandell* explained, it is appropriate for a trial court to deny a request for advisory counsel where there is "evidence [of] a

---

[10]    Notably, the trial court did hold several *Marsden* hearings and did specifically address the public defender's alleged conflict of interest, but Quintero does not assert the trial court erred in any of its rulings at those proceedings.

manipulative endeavor to obtain the appointment of private counsel without a showing of conflict or inadequacy sufficient to remove the public defender in the first instance." (*Crandell, supra*, 46 Cal.3d at p. 863.)

Quintero relies on *People v. Mattson* (1959) 51 Cal.2d 777 to assert the denial of his request was error because advisory counsel would have promoted justice and allowed the matter to proceed in an "orderly and expeditious" manner. (*Id.* at p. 797.) In *Mattson*, the California Supreme Court confirmed matters related to the appointment of advisory counsel "are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause." (*Ibid.*) The Court continued, "[t]he [trial] court, however, should *not* permit a litigant both to have counsel and to actively participate in the conduct of the case (as by conducting examination of witnesses, interposing objections, arguing points of law or of fact, addressing the jury, etc.) *unless* the court on a substantial showing determines that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (*Ibid.*, italics added.) The Court did not hold, as Quintero suggests, the trial court *must* appoint advisory counsel any time doing so would promote justice or efficiency. Regardless, Quintero did not argue he needed advisory counsel for the presentation of his case at trial, nor did he make the type of showing described in *Mattson*.

Moreover, Quintero was educated and capable of self-representation. He was competent, could read and write in English, and had completed approximately 120 college credits. During the *Faretta* hearing, the trial court observed: "Having talked to Mr. Quintero, I think he's much brighter and

well[-]spoken than most defendants who ask to go pro per, so I don't think there's going to be a competency issue." Quintero argues he did not have any legal knowledge or experience but, of course, the vast majority of self-represented litigants do not. The record demonstrates Quintero was capable of understanding the proper mechanism for bringing a discovery motion once the trial court explained the discovery process. Although the trial court indicated some of the claims included in the motion were civil matters, and were not appropriate for a criminal case, Quintero was able to obtain at least some relief with respect to other, properly raised issues. And again, Quintero never directly indicated he needed assistance with understanding the law or legal processes; he simply raised concerns with the efficiency of OAC's *administrative* services.

Quintero further asserts the charges against him were serious and the case was both legally and factually complex. We acknowledge the charges were serious, and there is at least some suggestion in the record the Attorney General was still considering the death penalty when the trial court refused to appoint advisory counsel. However, the case ultimately was not a capital case and did not involve the type of difficult statutory construction or constitutional issues present in *Bigelow*. (See *Bigelow, supra,* 37 Cal.3d at p. 743 ["The case arose under the 1978 death penalty initiative, an enactment rife with constructional and constitutional difficulties, which had not yet been judicially interpreted."].) Quintero argues the different charges here required different mental states but does not assert, or present any evidence in the record indicating, he had difficulty understanding or applying the relevant legal principles.

In *Crandell*, our high court distinguished the holding in *Bigelow* and found the *Watson* standard of prejudice applicable, where "the defendant was

21

charged only with the multiple-murder special circumstances, which presented no significant construction problems," and "demonstrated substantial competence." (*Crandell, supra,* 46 Cal.3d at p. 864.) Likewise, here, the charges did not raise any novel constitutional issues, Quintero's request for assistance was limited, and Quintero was substantially competent. Thus, the denial of Quintero's request would not have been an abuse of the trial court's discretion, had the trial court exercised that discretion.

Applying the *Watson* standard, it is not "reasonably probable that different verdicts would have been returned had [Quintero] received the assistance of advisory counsel." (*Crandell, supra,* 46 Cal.3d at p. 866.) Importantly, unlike the defendants in *Bigelow* and *Crandell*, Quintero was ultimately represented by competent, appointed counsel at trial and the jury still convicted him on all asserted charges. Quintero's reason for initially rejecting appointed counsel was he wanted to present a *less* zealous defense. Given Quintero's explanation, it is difficult to conceive of a scenario in which he would have received a better outcome at trial if he had remained self-represented, even with the assistance of advisory counsel.

In sum, we conclude the trial court did not fail to exercise its discretion when it denied either of Quintero's requests for advisory counsel, but even if it did, the error was not prejudicial and does not warrant reversal.

## II.

*Any Unpaid Portion of the $154 Criminal Justice Administration Fee Shall Be Vacated*

Quintero requests we modify the judgment to strike the $154 criminal justice administration fee based on recent changes to the law.

After Quintero was sentenced, Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill No. 1869) was signed into law. As of July 1, 2021, pursuant to Assembly Bill No. 1869, the statutory provision pursuant to which the court ordered Quintero to pay a $154 criminal justice administration fee (former section 29550.1 of the Government Code) was repealed, and Government Code section 6111 was added. (Assem. Bill No. 1869, §§ 11, 24.) Government Code section 6111, subdivision (a), provides that: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

The Attorney General concedes, and we agree, Quintero is entitled to vacatur of any unpaid balance of his criminal justice administration fee as of July 1, 2021.

## DISPOSITION

Any portion of the $154 criminal justice administration fee imposed pursuant to former Government Code section 29550.1 unpaid as of July 1, 2021 is vacated.  The judgment as modified is affirmed.

DO, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.

24